IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| WESTPORT INSURANCE,<br><br>               Plaintiff,<br><br><br>     vs.<br><br><br>RAY QUINNEY & NEBEKER, BRENT D.<br>WRIDE, DAVID K. LAURITZEN,<br>EDUCATORS MUTUAL INSURANCE<br>ASSOCIATION OF UTAH, and DAVID K.<br>LAURITZEN PC,<br><br>          Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br><br><br>Case No. 2:07-CV-236-TC |
| RAY QUINNEY & NEBEKER, BRENT D.<br>WRIDE, DAVID K. LAURITZEN,<br><br>       Third Party Plaintiffs<br><br><br>     vs.<br><br><br>ST. PAUL FIRE & MARINE INSURANCE<br>CO.,<br><br>       Third Party Defendant. | |

This case arises out of a dispute over malpractice insurance coverage for Ray Quinney &

Nebeker (RQN) and David K. Lauritzen PC (Lauritzen PC) for a claim brought in state court by

Educators Mutual Insurance Association (EMIA). Westport Insurance Company (Westport), RQN's liability insurance carrier at the time the EMIA claim was filed, filed this Declaratory Judgment Act suit against RQN; Brent Wride, an RQN attorney; and David K. Lauritzen, a former RQN attorney (the "RQN Defendants"), seeking a judgment that RQN's Westport Policy imposes no duty to defend or indemnify the RQN Defendants in state court. Westport also seeks a declaratory judgment against Mr. Lauritzen and Lauritzen PC (the "Lauritzen Defendants") that it has no duty to defend and indemnify the Lauritzen Defendants in the state court action under a separate policy issued to the them. The Defendants brought counterclaims against Westport for breach of contract and infliction of emotional distress. The RQN Defendants brought a third party complaint against St. Paul Fire & Marine Insurance Company's (St. Paul), RQN's previous liability insurance carrier, alleging breach of contract and infliction of emotional distress for failure to defend and indemnify them in the state court action.

Three motions for summary judgment are currently before the court. First, Westport has filed a motion asking that the court find that it has no duty to defend or indemnify the RQN Defendants under RQN's Westport policy and no duty to defend or indemnify the Lauritzen Defendants under Lauritzen PC's separate Westport policy. In addition, Westport's motion seeks summary judgment on the RQN Defendants' and the Lauritzen Defendants' counterclaims. The Defendants have responded to the motion both on the merits and by requesting relief under Federal Rule of Civil Procedure 56(f).

Second, St. Paul has filed a motion to dismiss the RQN Defendants' third party complaint, which this court must treat as a motion for summary judgment. In addition to responding to the merits of this motion, the RQN Defendants have asked for relief under Rule 56(f).

2

Finally, the Lauritzen Defendants have filed a motion for partial summary judgment against Westport on the issue of Westport's duty to defend them under the separate Lauritzen policy in the state court action.

For the reasons set out below, the court DENIES Westport's motion for summary judgment, with the exception of the Defendants' claim for intentional infliction of emotional distress; DENIES St. Paul's motion for summary judgment on the grounds that the RQN Defendants have demonstrated a need for further discovery in accordance with Rule 56(f); and GRANTS the Lauritzen Defendants' motion for partial summary judgment.

**BACKGROUND**

EMIA's Relationship with RQN

EMIA was a client of RQN and was represented by Mr. Lauritzen and Mr. Wride. On August 15, 2003, RQN received a letter from a new EMIA attorney. That attorney informed RQN that EMIA was a named defendant in a qui tam case related to its kidney transplant and dialysis benefits program. Because the case was under seal, EMIA did not know the precise allegations of the complaint. In the letter, EMIA's attorney wrote that RQN "furnished legal services relating to the issues under government investigation to EMIA during the relevant time period" and that "EMIA's internal investigation . . . suggests that RQN may not have acted with the applicable standard of care in furnishing those services." (Pl.'s Mem. in Supp. of Summ. J., Exhibit A) According to the letter, EMIA believed it could have claims against RQN and asked RQN to enter into a one-year tolling agreement because EMIA was poised to begin settlement negotiations with the federal government, which might "reduce RQN's exposure (if any)." (Id.) The letter informed RQN that settlement negotiations were scheduled for September 2003 and "because any such discussions may ultimately

3

have an impact on RQN, we request that you notify your professional liability carrier as appropriate."
(Id.)

In response to this letter, RQN asked EMIA to provide more information before it would consider agreeing to a tolling agreement.  In particular, RQN noted that it did not believe it was ever asked to advise EMIA on adding or changing kidney benefits.

EMIA replied to RQN on September 30, 2003, writing, "RQN and its professional liability carrier have equal if not superior access to the facts underlying this dispute, including the nature of the advice that RQN furnished or failed to provide to EMLA."  (Pl.'s Mem. Supp. Summ. J., Ex. B)  EMIA refused to add any additional information and suggested that "if you have not already done so, notify your professional liability carrier to avoid any issues with late notice."  (Id.)

RQN responded by letter on October 20, 2003, stating that RQN believed there was no basis for EMIA's allegations.  RQN wrote that "our firm was never asked by EMIA to advise it with respect to the design of EMIA's kidney transplant and dialysis benefits, or specifically with respect to the legality of those benefits under the Medicare Secondary Payor Program, which we understand to be at issue in the federal investigation."  (Jardine Decl., Ex. D)  RQN explained that "we do not believe we are in a position to notify our professional liability carrier of a potential claim simply because you have not advised us of the specific circumstances in which you believe members of our firm did not act with the applicable standard of care."  (Id.)  EMIA did not respond to this letter.

St. Paul's Coverage of RQN

At the time EMIA and RQN were exchanging letters, RQN's liability carrier was, and had been for some time, St. Paul.  The St. Paul policy stated it was a "claims-made insuring agreement" that covers "a claim or suit first made or brought, and reported to [St. Paul], while [the] agreement

is in effect." (RQN Defs.' Opp'n Mot. to Dismiss, Ex. A)  RQN generally received advice from St. Paul through its agent, Mr. Nilsson, who had instructed RQN to notify him of any threatened or formal claims against RQN.  As a general course of practice, Mr. Nilsson would relay St. Paul's instructions regarding potential claims to RQN and regularly told RQN that it was not necessary for RQN to report threatened claims by clients until a formal complaint was filed.  RQN has submitted no direct evidence that Mr. Nilsson followed this practice regarding the EMIA letters.

<u>The Lauritzen Defendants</u>

While he was a partner at RQN, Mr. Lauritzen represented EMIA on several matters.  In 2003, Mr. Lauritzen became of counsel at RQN.  After becoming of counsel, he entered into a separate agreement with EMIA for legal services, effective March 2003 (the "Lauritzen retainer").  That agreement obligated EMIA to pay a non-refundable retainer to Mr. Lauritzen if EMIA terminated the agreement.

Mr. Lauritzen also opened his own practice, Lauritzen PC.  From April 2003 to April 2004, Mr. Lauritzen and Lauritzen PC were insured by Westport.  This policy (the "Lauritzen Policy") had an effective date of April 2, 2003, and did not cover any claims made before that date.  Furthermore, the policy stated: "There is no coverage for [Lauritzen PC] for any liability, vicarious or otherwise resulting from any act, error, omission, circumstance, or personal injury of [RQN]."  (Plaintiff's Mem. in Supp. Summ. J., Ex. F at 4)  This exclusion denied coverage for "any claim based upon, arising out of, attributable to, or directly or indirectly resulting from" the actions of RQN.  (<u>Id.</u>, Ex. F at 12)  During the period the Lauritzen policy was in effect, some of Mr. Lauritzen's work for EMIA was billed through RQN and some was billed through Lauritzen PC.

In July of 2003, EMIA terminated the retainer agreement with Mr. Lauritzen and refused to

pay the retainer.  In September, Mr. Lauritzen sued EMIA for payment of the retainer.  In November, EMIA moved to stay Mr. Lauritzen's suit pending the outcome of the qui tam lawsuit.  In support of the motion to stay, EMIA alleged that Mr. Lauritzen might have provided negligent legal advice to EMIA.  In October 2003, Mr. Lauritzen terminated his relationship with RQN.  Sometime between January and March 2004, Mr. Lauritzen informed Westport and his insurance broker of the allegations that EMIA had made in its motion to stay.  The broker provided him with a Claim Information Supplement Professional Liability form for Westport, which Mr. Lauritzen filled out and faxed to Westport on March 16, 2004.  That form listed the date of the claim/incident as "1999-2002."  It also noted that at that time no claim had been made.

<u>RQN's Westport Policy</u>

On December 29, 2004, RQN completed and submitted a renewal application to St. Paul. Question 42 of the application asked, "[d]o you or any members or employees of your firm know of any incident, act, error, or omission that could reasonably result in a claim or suit against you, your firm, or any current or former firm member?"  (Pl.'s Mem. Supp. Summ. J., Ex. C)  RQN marked "no."

During the renewal process, RQN learned that St. Paul's policy limits had been decreased. RQN began to look elsewhere for liability insurance.  One of RQN's primary concerns was ensuring that changing insurance carriers would not create a gap in liability.  RQN decided to insure with Westport.  Westport accepted the renewal application that RQN had completed with St. Paul as an application for insurance with Westport.

The Westport policy covering RQN (the "Westport policy") became effective April 1, 2005. The Westport policy is a claims made and reported policy, which means it provides coverage for

claims first made against the insured, and reported to Westport, during the coverage period.  (Pl.'s Mem. Supp. Summ. J., Ex. D)

The coverage, however, included several exclusions.  This included an exclusion stating that "this policy shall not apply to any claim based upon, arising out of, attributable to, or directly or indirectly resulting from: . . . any act, error, omission, circumstance or personal injury occurring prior to the effective date of this policy, if any insured at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or personal injury might be the basis of a claim."  (Pl.'s Mem. Supp. Summ. J., Ex. D, at Section XIV)  The policy also required the insured give written notice of a potential claim at the time the insured first became aware of the claim. Furthermore, the policy guaranteed payment for any loss incurred as a result of claims first made against the insured during the policy period.

<u>EMIA's suit against the RQN Defendants</u>

On February 28, 2006, EMIA's counsel sent RQN a letter describing the amounts EMIA paid in the <u>qui tam</u> suit, asking RQN to sign a tolling agreement, and informing RQN that, if the agreement was not signed, EMIA would file a complaint in the very near future.  RQN forwarded the letter to Mr. Nilsson, who was now acting as RQN's broker.  Mr. Nilsson told RQN that it was not necessary to report the matter to Westport at that time.  RQN provided written notice of the claim to Westport on March 13, 2006.  Mr. Lauritzen also received a copy of the February 28 letter from EMIA and informed Westport of its contents on March 8 or March 9.  On April 25, 2006, Westport denied coverage under the prior acts exclusion, maintaining that the 2003 letters from EMIA constituted prior knowledge of wrongful acts.

<u>Mr. Lauritzen's suit against EMIA</u>

In May 2006, Mr. Lauritzen had settlement negotiations with EMIA in his breach of contract suit related to EMIA's failure to pay the retainer. Mr. Lauritzen informed Westport that a settlement in the contract action could provide an affirmative defense in any malpractice suit filed by EMIA, because the malpractice suit would constitute a compulsory counterclaim. Westport gave Mr. Lauritzen an amount of money as an incentive to settle; shortly thereafter, Mr. Lauritzen settled the lawsuit with EMIA.

Westport's coverage of the Lauritzen Defendants

On May 24, 2006, Westport agreed to defend Mr. Lauritzen in the malpractice suit, but only under a reservation of rights. Mr. Lauritzen hired his own counsel who asked Westport to maintain a wall between Mr. Lauritzen's policy and RQN's policy and to handle the claims under each policy as if they were issued by different companies.

On October 12, 2006, Westport notified Mr. Lauritzen that it would consider him an insured under the RQN policy for acts rendered on behalf of RQN and, as a result, there was no longer any conflict of interest between the two policies. It refused to continue to pay Mr. Lauritzen's attorney. The two sides argued over payment of Mr. Lauritzen's attorney, but ultimately the attorney was paid under the RQN policy until September of 2008. At that time, Westport stopped payment on the grounds that Mr. Lauritzen had been advised in August 2006 that it would not pay his attorney fees.

In March 2007, EMIA indicated it was willing to pursue a separate settlement with Mr. Lauritzen. Westport offered to pay half of any settlement Mr. Lauritzen independently negotiated with EMIA, up to $100,000, which was below Mr. Lauritzen's policy cap. Mr. Lauritzen rejected this co-payment arrangement and requested permission to negotiate a settlement with EMIA in the low $100,000s. Westport never responded.

8

Westport's coverage of the RQN Defendants

On August 24, 2006, Westport notified RQN that it had reversed its coverage position after it learned that Mr. Lauritzen had provided notice to Westport of the EMIA claim in 2004. It stated that based on the new information it would extend a defense to RQN and Mr. Lauritzen under a reservation of rights.

St. Paul's Coverage of the RQN Defendants

In July 2006, RQN sent a letter to St. Paul requesting that it defend and indemnify RQN against the EMIA claim. St. Paul refused on the grounds that EMIA did not make a claim against RQN during the coverage period and, under the circumstances, RQN had no knowledge that it had committed a wrongful act and therefore had nothing to report to St. Paul.

On February 13, 2007, EMIA filed the underlying lawsuit against RQN, Mr. Wride, Mr. Lauritzen, and Lauritzen PC in Utah state court.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Justice v. Crown Cork & Seal Co., Inc., 527 F.3d 1080, 1085 (10th Cir. 2008). The court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008).

This court's jurisdiction in this case is based on the parties' diversity of citizenship. 28 U.S.C. § 1332. In a diversity case, the court applies the substantive law of the forum state, here

Utah.  Garcia v. Int'l Elevator Co., Inc., 358 F.3d 777, 779 (10th Cir. 2004).

**ANALYSIS**

I.      Westport's Motion for Summary Judgment Against the RQN Defendants

Westport argues that, as a matter or law, the "prior knowledge exclusion" in the policy covers the claims made by EMIA.  RQN disputes this contention.  The question of whether an attorney's malpractice coverage should be denied under a prior knowledge exclusion is analyzed using a subjective/objective standard.  Under this standard, the court should first "consider the subjective knowledge of the insured and then the objective understanding of a reasonable attorney with that knowledge."  Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F.3d 302, 306 (3d Cir. 2001).

The Westport policy denied coverage for "any act, error, omission, circumstance or personal injury occurring prior to the effective date of this policy, if any insured at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or personal injury might be the basis of a claim."  (Pl.'s Mem. Supp. Summ. J., Ex. D, at Section XIV (emphasis added))  The court must decide whether an attorney, with RQN's subjective knowledge, would reasonably have foreseen that an "act, error, omission, circumstance or personal injury" had occurred that might be the basis for a claim.  See Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P., 267 F.Supp.2d 601, 611 (E.D. Tex. 2003) (analyzing identical policy language).

Westport points out that before completing the application for insurance, RQN was notified by EMIA that it believed it may have a claim against RQN.  In its letters to RQN, EMIA instructed RQN to notify its liability carrier of its potential liability.  Westport maintains that this is sufficient as a matter of law to put RQN on notice that a claim might be filed.

In response, the RQN Defendants emphasize that RQN believed it had not given any advice

10

to EMIA on the kidney benefits program, the subject of the qui tam suit.  In an October 20, 2003 letter to EMIA, RQN stated: "our firm was never asked by EMIA to advise it with respect to the design of EMIA's kidney transplant and dialysis benefits, or specifically with respect to the legality of those benefits under the Medicare Secondary Payor Program, which we understand to be at issue in the federal investigation."  (Jardine Decl., Ex. D)  Furthermore, the letter continued, "we do not believe we are in a position to notify our professional liability carrier of a potential claim simply because you have not advised us of the specific circumstances in which you believe members of our firm did not act with the applicable standard of care."  (Id.)  Moreover, even though RQN requested supporting information from EMIA about the basis of any claim EMIA might have against RQN, EMIA did not give RQN any additional information, reinforcing RQN's belief that it had never given advice about the kidney program.

Also, under the Westport policy, the appropriate inquiry is the knowledge of the insured "at the effective date."  (Id.)  The effective date of the Westport policy was April 1, 2005.  On that date nearly eighteen months had passed since the last correspondence between RQN and EMIA regarding the qui tam action.[1]  In the last correspondence between the parties, RQN had denied any involvement in the kidney benefits program and refused to sign any tolling agreement.  EMIA made no response or attempt to procure another tolling agreement over the eighteen-month period.  The tolling agreement that EMIA had requested would have expired in August of 2004, eight months before the effective date of the RQN policy.  EMIA's extended silence over this period significantly reduced the foreseeability of a claim.

---

[1] The last letter from EMIA to RQN was sent September 30, 2003.  RQN's last letter to EMIA was sent October 20, 2003.

In light of these competing facts, the court cannot find as a matter of law that a reasonable attorney in RQN's position, would have "reasonably foreseen" that RQN had committed an "act," "error," or "omission" that might be the basis of a claim by EMIA.  "Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment."  Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000) (quotation omitted).  As explained by the Utah Supreme Court: "[t]wo kinds of questions, then, are always to be decided by the jury if reasonable persons could differ about them on the evidence received at trial—first, fact questions in the usual sense and, second, evaluative applications of legal standards (such as the legal concept of 'foreseeability') to the facts."  Harline v. Barker, 912 P.2d 433, 439 (Utah 1996) (quotation omitted); Allen v. Minnstar, Inc., 97 F.3d 1365, 1369 (10th Cir. 1996) (applying Harline to hold that the Utah Supreme Court would "conclude that foreseeability of product misuse is generally a jury question").  Only if there could be no reasonable difference of opinion "on an evaluative application of the legal standard to the facts, then the decision is one of law for the trial judge or for an appellate court."  Harline, 912 P.2d at 439.  Here, a reasonable jury could draw different conclusions regarding the foreseeability of EMIA's claim.  Accordingly, Westport's motion for summary judgment is denied.

II.     St. Paul's Motion to Dismiss the RQN Defendants' Third-Party Complaint

At the hearing on the motion, the court informed counsel for St. Paul that the materials submitted by RQN included matters outside the pleadings and that the court would have to consider the motion as one for summary judgment.[2]  The court asked St. Paul if it would like the opportunity

---

[2] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R.Civ. P. 12(d).

to supplement its record with materials outside the pleadings.  St. Paul chose to proceed with the argument on the record as it stood.

In the third-party complaint RQN seeks a judgment ordering St. Paul to defend and indemnify the RQN Defendants in the EMIA suit.  St. Paul maintains that EMIA did not make a claim against RQN during the period when RQN was insured by St. Paul and that, therefore, St. Paul has no obligation to defend or indemnify RQN.  St. Paul further argues that even if there had been a claim, RQN was required to notify St. Paul in writing of the claim.  Because RQN did comply with this requirement, St. Paul contends that the the EMIA claim is not covered.

A.     Does the St. Paul policy provide coverage for claims brought after the coverage period ends?

First, St. Paul argues that because EMIA did not bring a formal claim against RQN during St. Paul's coverage period, there can be no coverage of EMIA's current suit, regardless of whether RQN properly made a report of the incident.  RQN disagrees.

"An insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts."  Alf v. State Farm Fire & Cas. Co., 850 P.2d 1272, 1274 (Utah 1993).  Although ambiguous terms must be construed in favor of coverage, "if a policy is not ambiguous, no presumption in favor of the insured arises and the policy language is construed according to its usual and ordinary meaning."  First Am. Title Ins. Co. v. J.B. Ranch, Inc., 966 P.2d 834, 836 (Utah 1998).

The St. Paul Policy sets out the scope of the liability protection in three sections.  First, the policy covers "damages for covered loss that: results from the performance of professional services; and is caused by a wrongful act committed on or after the retroactive date and before the ending date

13

of this agreement." (RQN Defs.' Opp'n Mot. to Dismiss, Ex. A, at 1-2 of 10)

Second, the policy includes a section entitled "When This Agreement Covers," which limits the policy to claims or suits "first made or brought against a protected person during the policy year and while this agreement is in effect; and first reported to us during the policy year." (Id. at 5 of 10) The section goes on to state "[w]e will also apply this agreement to any covered wrongful act first reported to us during the policy year and while this agreement is in effect." (Id.)

Finally, the policy has a section titled "What To Do If You Have A Loss—Lawyers Professional Liability."[3] (Id. at 9) This section instructs that the insured "must: give us notice in writing of any claim or known wrongful act that you or any protected person could reasonably foresee resulting in a claim as soon as practicable and during the policy period." (Id.) It also provides that "[i]f any protected person becomes aware of the circumstances which may result in a claim and gives written notice of the potential claim during the policy period . . . the potential claim will be treated as if made during the period of this agreement." (Id.) The St. Paul policy defines "claim" as "a demand that seeks monetary damages." (Id. at 3)

The above language makes clear that in addition to claims or suits brought during the coverage period, the St. Paul policy provides coverage for damages caused by a wrongful act committed during the policy period if the wrongful act is reported during the policy period. Coverage also exists if an insured was aware of circumstances that might result in a claim if the insured gives written notice of the potential claim during the policy period. The policy is

---

[3]This section states that it replaces a section titled "When This Policy Provides Liability Protection," but, there is no such section in the policy to replace. (RQN Defs.' Opp'n Mot. to Dismiss, Ex. A, at 9 of 10)

unambiguous in that it <u>requires</u> an insured to report, in writing, "any <u>claim</u> or <u>known wrongful act</u> that you . . . could reasonably foresee resulting in a claim."  (<u>Id.</u> (emphasis added))  But "circumstances which <u>may</u> result in a claim" (but are not known wrongful acts and have not yet resulted in a claim) are not required to be reported, rather they are <u>permitted</u> to be reported.  (<u>Id.</u>) (emphasis added)  If the insured chooses to report such circumstances, "the potential claim will be treated as if made during the period of this agreement."  (<u>Id.</u>)

It is undisputed that during the period of St. Paul's coverage of RQN, EMIA had not yet made a claim against RQN nor was RQN aware of a known wrongful act.  But, as explained above, coverage would have existed if RQN had reported "circumstances which may result in a claim" to St. Paul.  (<u>Id.</u>)  Therefore, if RQN properly reported the EMIA letters to St. Paul, and the letters represented circumstances which may result in a claim, St. Paul would be obligated to provide coverage for EMIA's current claim.  As explained above, whether the EMIA letters would provide a reasonable attorney with notice that a claim would be filed is a matter of disputed material fact. Accordingly, St. Paul is not entitled to summary judgment on the grounds that the St. Paul policy could not have applied to the EMIA claim under any circumstances.

B.   <u>Was adequate notice given to St. Paul of the EMIA circumstances?</u>

St. Paul next argues that summary judgment should be granted because RQN did not provide proper notice, in writing, as required by the terms of the St. Paul policy.  It further maintains that RQN has not even met its burden for demonstrating that it gave Mr. Nilsson oral notice of the EMIA letters.  RQN responds that it did provide notice to Mr. Nilsson, St. Paul's agent.  RQN argues it was not required to provide written notice for two reasons: first, the written notice requirement conflicts with two notice provisions of Utah's insurance code; and, second, St. Paul should be equitably

estopped from asserting a notice defense because it encouraged RQN not to report the incident.

### 1. Utah law on Notice

RQN argues that under Utah law, oral notice to St. Paul's agent was sufficient. RQN further maintains that under Utah law, St. Paul must show it was prejudiced by not receiving written notice. St. Paul responds that, even assuming that Mr. Nilsson received oral notice, such notice was insufficient under the terms of the policy and there can be no coverage.

### a. Is the St. Paul Policy a "claims-made" policy?

Before addressing the substance of RQN's statutory arguments, the court must first consider what type of policy RQN purchased from St. Paul. Utah's insurance code sets forth different rules for so-called "claims-made" insurance policies and other types of insurance policies. "The typical claims-made policy provides insurance coverage for acts or omissions occurring either before or during the term of the policy, provided the claim is discovered and reported during the same policy term." AOK Lands, Inc. v. Shand, Morahan & Co., 860 P.2d 924, 926 (Utah 1993). Utah law defines "claims-made coverage" as "an insurance contract or provision limiting coverage under a policy insuring against legal liability to claims that are first made against the insured while the policy is in force." Utah Code Ann. § 31A-1-301(24). Utah law also requires that to "limit coverage under a policy insuring against legal liability to claims that are first made against the insured while the policy is in force," the policy must contain on its cover page "a conspicuous statement that the coverage of the policy is limited in that way." Id. § 31A-22-204. The RQN Defendants argue that because the St. Paul policy does not list the requirement of giving notice as an express element of coverage, but rather as a condition precedent, it cannot be a claims-made policy.

The policy must be read as a whole to determine its meaning. Nielsen v. O'Reilly, 848 P.2d

664, 665 (Utah 1992) ("Specifically, the terms of insurance contracts, as well as all contracts, are to be interpreted in accordance with their usually accepted meanings and should be read as a whole, in an attempt to harmonize and give effect to all of the contract provisions."). The St. Paul policy unambiguously states on its cover page that it is a claims-made policy that requires reporting of a claim during the policy period. Read as a whole, the policy limits its coverage to those claims, wrongful acts, or circumstances that might give rise to a claim and that are reported to St. Paul during the coverage period. This requirement comports with the definition of claims-made policy under Utah law.

### b.  Does Utah law mandate that oral notice is sufficient?

St. Paul argues that even assuming there was a covered claim or wrongful act and RQN gave oral notice to Mr. Nilsson, RQN did not comply with the policy's terms by reporting the potential claim to St. Paul <u>in writing</u> during the coverage period. RQN takes the position that the oral notice to Mr. Nilsson was sufficient under the agent-notice provisions of the Utah insurance code.[4]

The Utah code provides that when "notice of loss" is required by an insurance policy, notice of the authorized loss to any authorized agent of the insurer "with particulars sufficient to identify the policy" is notice to the insurer. <u>Id.</u> § 31A-21-312(1)(a). The Utah Administrative Code, which clarifies that "'notice of claim or loss' means any notification, whether in writing or other means acceptable under the terms of an insurance policy or insurance contract, to an insurer or its agent, by a claimant, which reasonably apprizes the insurer of the facts pertinent to a claim." Utah Admin.

---

[4]Insurance policies which contain any provisions not in compliance with the Utah insurance code are construed and applied as if they were in full compliance. Utah Code Ann. § 31A-21-107(2).

Code R590-190-3(9).[5]

RQN admits that it did not give written notice to St. Paul's agent, Mr. Nilsson, as required by the unambiguous terms of the St. Paul Policy. Nothing in the Utah insurance provision cited by RQN prevents an insurer from including additional requirements regarding the form that such notice should take. Also, the Administrative Code provides that a policy may require written notice. The St. Paul policy limits the acceptable form of notice to notice in writing and this limitation is permitted by Utah law. Accordingly, RQN would not have complied with the terms of the policy by informing Mr. Nilsson of the letters over the phone and any notice was ineffective.

### c. Is St. Paul required to show it was prejudiced?

RQN contends that Utah's notice-prejudice provision bars summary judgment in this case. The Utah insurance code states that "[f]ailure to give notice or file proof of loss as required by Subsection (1)(b) does not bar recovery under the policy if the insurer fails to show it was prejudiced by the failure." Utah Admin. Code § 31A-21-312(2). Under Subsection (1)(b), "failure to give any notice . . . of loss required by the policy within the time specified in the policy does not invalidate a claim made by the insured, if the insured shows that it was not reasonably possible to give the notice . . . within the prescribed time and that notice was given . . . as soon as reasonably possible." St. Paul relies on a separate provision of the code that states "Subsection 31A-21-312(1) may not be construed to extend the normal provisions of any claims-made coverage that required notice of an occurrence or claim prior to the expiration of the policy for coverage to be in force." Id. § 31A-22-203.

---

[5]The Utah insurance code grants the Insurance commissioner authority to promulgate rules to implement the provisions of the code. Utah Code Ann. § 31A-2-201(3).

Section 31A-22-203, which limits the application of notice provisions to claims-made policies, applies to § 31A-21-312(2).   Section 31A-21-312(2) explicitly incorporates subsection § 31A-21-312(1)(b) and defines notice by its terms.   Because § 31A-22-203 excludes claims-made policies from the notice rules of § 31A-21-312(1)(b), § 31A-21-312(2) also does not apply to claims-made policies.

This reading also comports with longstanding interpretation of claims-made policies.   As explained by the Utah Supreme Court,

> "Claims made" policies enable the insurer to underwrite the risk, compute the premiums, and establish reserves with greater accuracy, safe in the assumption that liability will be limited to claims actually made during the policy for which the premium is computed.   As a result, the insurer is better able to predict the limits of its exposure and more accurately estimate the premium rate schedule necessary to accommodate the risk undertaken.

AOK Lands, Inc., 860 P.2d at 927 (quotation and alteration omitted).   Many courts have noted that excusing the requirement that claims be reported to the insurer during the policy period would alter a fundamental term of a claims-made policy and would impermissibly expand the scope of coverage. See, e.g., Ins. Placements, Inc. v. Utica Mut. Ins. Co., 917 S.W.2d 592, 597 (Mo. Ct. App. 1996); St. Paul Fire & Marine Ins. Co. v. Estate of Hunt, 811 P.2d 432, 435 (Colo. App. 1991); Esmailzadeh v. Johnson and Speakman, 869 F.2d 422, 424 (8th Cir. 1989).   As explained by the Third Circuit,

> Notice provisions serve different purposes in occurrence and claims-made policies. In an occurrence policy, notice provisions are included to help the insurer investigate, settle, and defend claims; they do not define coverage and should be "liberally and practically construed":
>
> By contrast, the event that invokes coverage under a "claims made" policy is transmittal of notice of the claim to the insurance carrier.   Thus, an extension of the notice period in a "claims made" policy constitutes an unbargained-for expansion of

coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy.

Continisio, 17 F.3d at 68 (quotation and alteration omitted).

Accordingly, because the St. Paul Policy is a claims-made policy, the court will not expand the scope of the policy's coverage by adding a requirement that St. Paul show prejudice.

### 2. Should St. Paul be equitably estopped from enforcing the notice provisions?

RQN argues that because it provided oral notice of the EMIA letters to St. Paul's agent and was told not to provide written notice of the incident, St. Paul should be estopped from asserting that the notice was inadequate. St. Paul responds that there is no evidence that any notice was given to Mr. Nilsson and estoppel is inappropriate in these circumstances.

### a. Was oral notice given to Mr. Nilsson?

St. Paul argues that the RQN Defendants have not met their burden of showing that Mr. Nilsson was informed of the EMIA letters. Neither Mr. Nilsson nor RQN's representative who spoke with Mr. Nilsson, Eric Visser, testified to a direct recollection of a conversation concerning EMIA's letters. Rather, they testified that their course of dealing was for Mr. Visser to call Mr. Nilsson and discuss potential claims with him. Mr. Nilsson would then tell Mr. Visser whether RQN should support the claim. Mr. Wride testified that he received a phone call from Mr. Visser telling him that Mr. Nilsson had said it was not necessary to report the letters to St. Paul. Mr. Nilsson and Mr. Visser testified that this advice would be consistent with their usual course of dealing. This recounting Mr. Visser's statement is inadmissible hearsay. On the record currently before the court, there is no evidence that Mr. Nilsson was given any notice of the EMIA claims. However, as discussed later in the this order, the court will allow discovery on this issue.

20

### d.  Is St. Paul estopped from asserting notice was inadequate?

RQN argues that in the event the EMIA letters constitute known wrongful acts or circumstances which may result in a claim, St. Paul is estopped from arguing the letters had to be reported during the policy period because Mr. Nilsson advised RQN not to report the letters.

Under Utah law,

> Estoppel may be applied to modify terms of an insurance policy when (1) an agent makes material misrepresentations to the prospective insured as to the scope of coverage or other important policy benefits, (2) the insured acts with prudence and in reasonable reliance on those misrepresentations, and (3) that reliance results in injury to the insured.

Youngblood v. Auto-Owners Ins. Co., 158 P.3d 1088, 1094 (Utah 2007).  In this case, both Mr. Nilsson and Mr. Visser's testimony indicates that St. Paul discouraged the reporting of potential claims.  Mr. Nilsson testified that St. Paul instructed him that "only formal claims should be reported to St. Paul." (Nilsson Dec. at 4)  This could potentially constitute a material misrepresentation as to the scope of coverage, because, as explained in Section II.A., the policy provided coverage for claims brought outside of the coverage period if the circumstances of the claim were reported within the coverage period.  Mr. Nilsson further testified that he told RQN to run its potential claims by him before reporting them to St. Paul.  Consequently, RQN may have behaved reasonably in seeking Mr. Nilsson's counsel regarding potential claims.

As discussed, the RQN Defendants have not submitted admissible evidence on whether Mr. Nilsson was told of the EMIA letters or whether St. Paul learned of the letters.  But, the RQN Defendants' Rule 56(f) affidavit requests discovery on, among other things, St. Paul's claim files regarding the RQN Defendants, St. Paul practices and policies regarding written notice of claims, whether St. Paul had a business practice of discouraging reporting, and whether St. Paul had

21

knowledge of the EMIA letters.

"To invoke the protection of Rule 56(f), the party filing the affidavit must state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment." <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d 1550, 1554 (10th Cir. 1993). In a Rule 56(f) affidavit, the RQN Defendants' attorney, Mr. David Olsen, requested, among other things, additional discovery on St. Paul's claim files regarding the RQN Defendants, St. Paul's policies, practices, and procedures on written notice claims, St. Paul's instructions to its agents on what to tell insureds about reporting claims, and what knowledge St. Paul had of the EMIA matter. These requests may enable RQN to meet its burden on summary judgment and the 56(f) request is granted. St. Paul's motion for summary judgment is denied without prejudice so that discovery may continue.

III.   <u>Mr. Lauritzen's Motion for Partial Summary Judgment</u>

Mr. Lauritzen seeks summary judgment on the issue of Westport's duty to defend him under his personal policy in the EMIA lawsuit. Westport argues that there are two reasons why it has no duty to defend. First, the Lauritzen Policy had an effective date of April 2, 2003, and Westport maintains that EMIA is only asserting claims that occurred before that date. Second, the Lauritzen Policy excluded coverage for acts by RQN or arising out of acts by RQN. Westport maintains that EMIA is limiting its suit to actions taken by Mr. Lauritzen under the RQN retainer agreement and such actions are excluded from coverage under the Lauritzen Policy.

An insurer's duty to defend is broader than its duty to indemnify. <u>Sharon Steel Corp. v. Aetna Cas. and Sur. Co.</u>, 931 P.2d 127, 133 (Utah 1997). "Its defense duty arises when the insurer ascertains facts giving rise to potential liability under the insurance policy." <u>Id.</u> As a general rule,

"an insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations in the complaint." Fire Ins. Exchange v. Estate of Therkelsen, 27 P.3d 555, 560 (Utah 2001) (quotation and alteration omitted). EMIA's complaint in the underlying state case alleged that Mr. Lauritzen provided legal services from April 2000 "at least into 2003." This includes the time Mr. Lauritzen entered into a private retainer agreement with EMIA, became of counsel at RQN, and the period he was covered under his own Westport policy, which was effective April 2, 2003. Accordingly, based on the language of the complaint, Wesport would have a duty to defend Mr. Lauritzen.

Westport does not deny that the complaint alleges misconduct that occurred after the effective date of Mr. Lauritzen's policy. Rather, it contends that, in subsequent pleadings, EMIA has limited itself to asserting claims against Mr. Lauritzen that occurred only during the time he was employed at RQN or arising out of his employment at RQN.

Under some circumstances a court may look to evidence outside the complaint to determine whether the insurer has a duty to defend. Whether extrinsic evidence is admissible rests on the terms of the policy. As the Utah Supreme Court explained,

> whether extrinsic evidence is admissible to determine whether an insurer has a duty to defend an insured turns on the parties' contractual terms. If the parties make the duty to defend dependent on the allegations against the insured, extrinsic evidence is irrelevant to a determination of whether a duty to defend exists. However, if, for example, the parties make the duty to defend dependent on whether there is actually a covered claim or suit, extrinsic evidence would be relevant to a determination of whether a duty to defend exists.

Estate of Therkelsen, 27 P.3d at 561. Mr. Lauritzen's Westport policy falls into the latter category

and the court may consider extrinsic evidence.[6]

Before the state court, Mr. Lauritzen moved to dismiss EMIA's claims on the grounds that they were a compulsory counterclaim in his earlier breach of contract case against EMIA and, because not raised at that time, were waived.  Westport argued in its response to that motion that EMIA had limited its claims against Mr. Lauritzen to those that occurred during the time Mr. Lauritzen was a shareholder at RQN and that arose out of the retainer between RQN and EMIA, claims that are specifically excluded under Mr. Lauritzen's policy.  The court does not read EMIA's state court pleadings to limit its claims in this way.

At the hearing on these motions EMIA's attorney informed the court that EMIA's state court claims could include services provided by Mr. Lauritzen after the April 2003 effective date of his Westport policy.  Furthermore, in its ruling on Mr. Lauritzen's motion, the state court noted that "virtually all of the services that are subject to the claim of malpractice in this case predated" April of 2003.  (Lauritzen Reply Mem., Ex. 1) (emphasis added)  This ruling leaves open the possibility that some of the contested services occurred after the effective date of Mr. Lauritzen's policy.

In addition, Westport submitted supplemental briefing after serving requests for admissions on EMIA and receiving EMIA's responses.  (Docket No. 134)  In its response to admissions, EMIA would not deny that it was seeking compensation from Mr. Lauritzen from acts committed by Mr. Lauritzen after April 2, 2003.  It did, however, admit that it was not seeking compensation from Mr. Lauritzen for his rendition of legal services under the retainer agreement between EMIA and Mr.

---

[6]The relevant policy provision provides that Westport shall have the duty "to defend any claim for loss against any insured covered by [the policy], even if such claim is groundless, false or fraudulent."  (Pl.'s Motion for Summ. J., Ex. F)  Under these terms, the possibility of a covered claim must exist for the insurer to have a duty to defend.

Lauritzen.  EMIA also stated it lacked sufficient information to admit or deny that it was seeking

compensation from Mr. Lauritzen for any legal services provided in his capacity at Lauritzen PC.

For a duty to defend to arise, there need only be facts showing a potential for coverage under

the policy.  Sharon Steel Corp., 931 P.2d at 133; Deseret Fed. Sav. & Loan Ass'n v. U.S. Fidelity

& Guar. Co., 714 P.2d 1143, 1147 (Utah 1986).  EMIA has made allegations of malpractice against

Mr. Lauritzen that extend beyond the April 3, 2003 effective date of the Lauritzen policy.  It has also

refused to limit its suit to actions by RQN by stating that it may be seeking compensation from Mr.

Lauritzen for action he took in his capacity at Lauritzen PC.  The Lauritzen policy unambiguously

covers Mr. Lauritzen in this capacity.  Although it is not certain that liability under the Lauritzen

policy will arise out of the state court action, it is apparent that EMIA's allegations create the

potential for such liability.  Accordingly, Wesport has a duty to defend Mr. Lauritzen in the state

court action.

IV.    RQN Defendants' and Lauritzen Defendants' Counterclaims

Westport has moved for summary judgment on the RQN and Lauritzen Defendants'

counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing,

negligent infliction of emotional distress, and intentional infliction of emotional distress.[7]  These

counterclaims arise out of Westport's refusal to defend and indemnify the RQN defendants.

Contract Claims

Westport argues that because it did not owe a duty to defend, and therefore did not act

wrongly in refusing to do so, the Defendants' contract counterclaims cannot survive summary

---

[7]The emotional distress claims are asserted by Mr. Wride and Mr. Lauritzen only.

judgment.   As explained above, Westport cannot establish that, as a matter of law, it had no obligation to provide coverage to the RQN Defendants.   In addition, the court has concluded that Westport does have a duty to defend the Lauritzen Defendants.   According, Westport's argument must fail.[8]

Emotional Distress Claims

Westport also maintains that there is insufficient evidence to support Mr. Wride's and Mr. Lauritzen's claims of intentional infliction of emotional distress and negligent infliction of emotional distress.   To prevail on a claim of intentional infliction of emotional distress under Utah law, a plaintiff must prove:

> (i) the defendant's conduct complained of was outrageous and intolerable in that it offended generally accepted standards of decency and morality; (ii) the defendant intended to cause, or acted in reckless disregard of the likelihood of causing, emotional distress; (iii) the plaintiff suffered severe emotional distress; and (iv) the defendant's conduct proximately caused the emotional distress.

Prince v. Bear River Mut. Ins. Co., 56 P.3d 524, 535 (Utah 2002) (quotation and alterations omitted).

"Outrageous conduct, for purposes of the tort of intentional infliction of emotional distress, is conduct that evokes outrage or revulsion; it must be more than unreasonable, unkind, or unfair." Id. (quotation omitted).   When considering the denial of insurance coverage, if an insurer's reason for denying benefits under the policy is fairly debatable, then, as a matter of law, the denial does not rise to the level of outrageous conduct that could give rise to liability for intentional infliction of emotional distress.   As explained above, the court concludes that a disputed issue of material fact

---

[8]In its reply memorandum Westport makes additional arguments as to why summary judgment should be granted on these claims.   The court will not consider arguments raised for the first time in reply.   DUCivR 7-1(b)(3) (dictating that "reply memorandum must be limited to rebuttal of matter raised in the memorandum opposing the motion").

exists as to whether RQN could have reasonably foreseen the potential EMIA claim.  As such, the

issue is fairly debatable and Westport is entitled to summary judgment on Mr. Wride's claim.

Furthermore, the issues concerning coverage of Mr. Lauritzen are also fairly debatable and

Westport's conduct was not outrageous as a matter of law.

A claim for negligent infliction of emotional distress does not require outrageous conduct.

Anderson Development Co. v. Tobias, 116 P.3d 323, 339 (Utah 2005).  Rather,

> if the actor unintentionally causes emotional distress to another, he is subject to
> liability to the other for resulting illness or bodily harm if the actor
>
>> (a) should have realized that his conduct involved an unreasonable
>> risk of causing the distress, otherwise than by knowledge of the harm
>> or peril of a third person, and
>>
>> (b) from facts known to him, should have realized that the distress, if
>> it were caused, might result in illness or bodily harm.

Id. (quotation omitted).  Westport maintains that the Utah Supreme Court would not recognize a

negligent infliction of emotional distress claim arising out of denial of insurance benefits.  But, Mr.

Wride and Mr. Lauritzen allege that their emotional distress claims arise out of Westport's entire

course of dealing, not just the denial of insurance benefits.

Also, Westport argues that Mr. Wride and Mr. Lauritzen have not produced sufficient

evidence to maintain this claim.  Mr. Lauritzen has alleged severe emotional distress from the stress

of Westport's actions resulting in sleeplessness, fatigue, and headaches.  Mr. Wride alleges tightness

in the chest and stomach, tension headaches, difficulty sleeping, and a stress induced tremor.  These

allegations suffice to meet their burden at this stage in the litigation.

**ORDER**

For the foregoing reasons, the Westport's motion for summary judgment is DENIED, expect

for the Defendants' claim of intentional infliction of emotional distress.  (Docket No. 50)  St. Paul's motion for summary judgment is DENIED on the grounds that the RQN Defendants have demonstrated a need for further discovery in accordance with Rule 56(f).  (Docket No. 58)  The Lauritzen Defendants' motion for partial summary judgment is GRANTED.  (Docket No. 68)

DATED this 7th day of August, 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge